## Case No. 17,443.

### WESTERN TRANSP. CO et al. v. The GREAT WESTERN et al.

[4 West. Law Month. 281.]

District Court, N. D. New York. June, 1862.

DISTRICT COURTS — ADMIRALTY JURISDICTION — FOREIGN VESSELS—ALLOWANCE OF SALVAGE.

1. Under the constitution of the United States and the judiciary act of congress of 1789 [1 Stat. 73], the district courts of the United States have plenary jurisdiction in admiralty of all cases arising on the Great Lakes, and other waters connected with them and the ocean, wherever practicably navigable, as well above as below the flow of the tide from the sea.

[Cited in The Leonard, Case No. 8,256.]

2. The restriction in the judiciary act of 1789, confining jurisdiction to waters navigable from the sea by vessels of 10 tons burden or more, applies, exclusively, to seizures under the laws of impost, navigation, or trade, in matters of revenue only.

3. This general jurisdiction is not abridged by the act of 1845 [5 Stat. 726], which was passed to extend the jurisdiction of district courts. It is possessed entirely independent of that act. The jurisdiction of the district court of the United States in case of salvage is not confined to American property, nor to cases occurring in American waters. The amount to be allowed for salvage is not prescribed by any rule, or limited to any proportional part of the value of the property saved, but rests entirely in the sound discretion of the court; and is dependent on the labor, perils, and dangers incurred by the salvors, and the good faith that they exercise towards the owners of the property saved. The want of good faith may be such as to reduce the salvage to a very small sum, or to destroy all claims to it.

I. Hubbell and E. Cook, for libelants.
G. B. Hibbard, for respondents.

HALL, District Judge. This is a cause of salvage, prosecuted by the owners, the master, and a portion of the crew of the steamer propeller Illinois, an American vessel of about 500 tons burden. The schooner Great Western, a Canadian vessel of about 192 tons burden, whilst on a voyage from Kincardine, Canada West, to Montreal, in Canada East, with a full cargo of wheat, collided with the American schooner Milwaukee Belle, of about 368 tons burden. The collision occurred in Canadian waters, about 25 miles east-northeast

from Rondeau, on the northern shore of Lake Erie, on the 5th of June, 1861, about half-past two o'clock in the morning. The night was very dark and rainy, and the signal lanterns of the Western were broken and their lights extinguished when the vessels struck. The Western was struck on her port bow by the luff of the starboard bow of the Belle, and the sterns of the two vessels then swung around until the two vessels lay side by side. The wind was blowing hard from the northeast, and there was a heavy sea. The two vessels were chafed and pounded together by the wind and sea, and the boat and one of the davits of the Great Western, and also a portion of her headgear, were carried away. The bowsprit was probably strained or sprung by the collision, but was not carried away until after the vessels finally separated. Immediately after the collision, and while the vessels were chafing and pounding, the pumps of the Western were tried, and it was found that she had taken in considerable water. After the pumps had been in operation for a very few minutes, one of the crew of the Western, after an examination of the fore peak, reported to her master that there were three inches of water over her ceiling. Efforts were made to separate the vessels, and in a short time the Belle, which was light—having only about 100 tons of coal on board as ballast—commenced ranging ahead of the Western. The officers of the latter then requested the master of the Belle to throw them a hawser and take them in tow. A hawser was accordingly sent on board the Western, and made fast to the foremast, and her mate, following most of the crew who had, without orders, already gone aboard the Belle, in the belief that the Western was so much injured and was taking in water so rapidly that there was danger of her going immediately down, endeavored to make hawser fast to a timberhead of the Belle. The master of the Western followed his mate on board the Belle, and desired the master of the latter vessel to take the former in tow. This was assented to, but, in the darkness, hurry, and confusion, the mate and those assisting him failed to get more than a single turn of the hawser around the timber-head, and, as the Belle ranged ahead, the hawser slipped, and for that reason was not made fast to the Belle. The vessels then separated, the hawser of the Belle still remaining fast to the foremast of the Western, and the master and the whole crew of the Western being on board the Belle. The master of the Western then requested the master of the Belle to keep near the Western until daylight. This he at first consented to do; but, on examining his vessel, and finding that two of the bolts of his chain-plates had been broken, he declined to do so, fearing he might lose his masts, and perhaps his vessel. He therefore told the master of the Western that it was sufficient to lose one vessel, and, putting his vessel before the wind, he proceeded up the lake. The Western was thus left by her master and crew, about three o'clock

in the morning, without any light or any person on board, and with the scuttle covering the entrance to the forecastle, and one of the slides covering the entrance to her cabin open. Through these openings she took in considerable water, as the waves broke over her; and it is possible, and indeed probable, that she was leaking slightly near the stem. In the morning she was out of sight from the Belle, and it is quite apparent that her master and crew believed there was scarcely a possibility that she was still above water, and that they entertained no expectation of again returning to the wreck. About two o'clock in the afternoon of the same day, or about eleven hours after she was thus abandoned, the Western was discovered by the officers of the Illinois. She was about 15 or 20 miles southeasterly from Rondeau Point, and was probably from 6 to 10 miles southeasterly of the line of the proper course of the Illinois, and of the ordinary track of vessels proceeding to Buffalo, to which port the Illinois was bound. The Illinois at once proceeded to the Western, and the mate and four men were immediately sent on board the wreck. They found her deserted, the bowsprit broken off near the stem, and floating alongside, her main gaff broken, her wheel broken to pieces, her rigging partially carried away, with spars, rigging, sails, and other things in a confused mass on deck, where they had been rolling and sliding about, chafing the Western's deck. The vessel was clearly in an unnavigable and most dangerous condition, and, if not fallen in with, would soon have gone down. On further examination, it appeared that there were about five feet of water on the floor of her forecastle, her cabin floor was wet, and she was so full of water that at her waist her sides were but little above the water of the lake. Though the wind had gone down, the dead sea still broke through her scuppers, and ran across the deck. She had settled down considerably by the head, and the water was running into her forecastle through a small opening made by the starting of the hood ends from her stem. In her then condition she would not probably have lived more than six hours in a perfectly calm sea, and she might have gone much sooner. The pumps of the Western were rigged and worked. Some other assistance was sent from the Illinois, and, after pumping two or three hours, she was considered safe to tow. She was then—between 4 and 5 o'clock in the afternoon—taken in tow by the Illinois, and the two vessels reached Port Stanley between 11 and 12 o'clock the same evening. Her pumps were kept in operation almost continually until the next day, and at intervals afterwards. The Illinois, as before stated, was a propeller of about 500 tons burden; and she was of the value of about $17,000. She had on board a cargo valued at more than $21,000, which consisted in part of live hogs; and in consequence of the previous storm, and the towing of the Western, the Illinois was short of fuel and needed food for the hogs on board. For this reason,

among others, it was thought expedient to go into Port Stanley for fuel, to leave the Western there, and to proceed to Buffalo with the Illinois and her cargo. The Illinois left Port Stanley towards morning, and proceeded to Buffalo. When she arrived, her owner sent the propeller Mary Stewart to Port Stanley, to tow the Western to this port. The Mary Stewart reached Port Stanley early in the morning of the 7th of June, and, taking the Western in tow, brought her to Buffalo, reaching here about 4 o'clock in the morning of the 8th of June. The dry wheat on board, amounting to about 6,089 bushels, was immediately stored in an elevator, and about 3,000 bushels of wet wheat were taken out, and put in a drying kiln, in order to preserve it from further injury. This suit was commenced soon after. The value of the Western when brought to Buffalo was about $4,600, and the net proceeds of the sales of her cargo amounted to $3,600, after deducting all charges and commissions.

The prominent and most important facts of this case have now been briefly stated, and its general characteristics sufficiently set forth; but other facts and circumstances, upon which the question now to be discussed may in part depend, will hereafter be noticed in more immediate connection with the questions to which they may respectively relate. It is not insisted, on the part of the claimants, that the services rendered to the Western were not in their nature and character salvage services; but it is insisted that they were rendered without personal risk, or extraordinary effort; and that, therefore, the libellants are not, in any court, or before any tribunal, entitled to ask more than a very slight salvage compensation. It is also strenuously insisted that this court has no jurisdiction to award any salvage to the libellants, and that the libel must therefore be dismissed for want of jurisdiction. It is not urged that the fact that the vessel and cargo proceeded against were the property of British subjects, and the fact that she was found by the salvors in the waters of Canada, necessarily deprive this court of jurisdiction. The jurisdiction of a court of admiralty to award salvage for the rescue of a foreign vessel from impending danger, is well established, and is not, at this time, to be questioned. In the case of The Two Friends, 1 C. Rob. Adm. 271, which was a case of salvage on the recapture or rescue of an American ship by the crew, a part of whom were British seamen. Sir William Scott, in 1779, decided this question in favor of the jurisdiction. The Two Friends had been captured by the French, and the crew having rescued her from the captors, and brought her into England, the British seamen belonging to the crew libelled her for salvage. It was objected that the English court of admiralty had no jurisdiction, as the Two Friends was an American ship, but the objection was overruled. Sir William Scott, in delivering his opinion overruling the objections, referring to the allegation that the libellants were to be

considered as American seamen, said: "I will say without scruple that I can see no inconvenience that would arise if a British court of justice was to hold plea in such a case, or, conversely, if American courts were to hold pleas of this nature respecting the merits of the British seamen on such occasion; for salvage is a question of the jus gentium, and materially different from the question of a mariner's contract, which is a creature of the particular constitutions of each country, to be applied and construed and explained by its own particular rules." In the course of his opinion he also said: "As to those British seamen having no connection with America, and having rescued foreign property, I have no doubt that they are entitled to have their services rewarded here; for it would be but a mere mockery and derision of their claims to send them back to America, to hunt out their redress against each individual owner of separate bales of goods. It were better to inform them that they were entitled to nothing, than to remit them on such a wild pursuit. I should therefore think it a reproach to the courts of this country if they are not opened to lend their assistance in such a case." And although he desired to be understood to deliver no decided opinion, whether American seamen rescuing an American ship and cargo, brought into England, might not maintain an action in rem in the admiralty as a court of the law of nations, he added: "But if there was British property on board, and American seamen were to proceed against that, I should think it a criminal desertion of my duty if I did not support their claim." And in the subsequent case of The Good Intent, an English vessel recaptured from the French by an American armed ship, without resistance, on account of the larger force of the American vessel, he awarded salvage; no opposition to the jurisdiction having been made. 1 C. Rob. Adm. 286. In subsequent cases, both the English and American courts of admiralty have maintained their jurisdiction against foreign vessels, in cases of salvage, of bottomry, of collision, and even of seamen's wages, by clear and unquestionable arguments (see 1 Conk. Adm. pp. 34–39, and cases there cited), and it is now so firmly established that the learned counsel of the libellants, in questioning the jurisdiction in the present case, did not urge that this court had no jurisdiction, in case its jurisdiction in admiralty cases was plenary, and was not circumscribed or limited by the acts of congress by which the jurisdiction of this court had been conferred and regulated. The objection to the jurisdiction in the present case is based upon the act of congress passed in 1845, for the declared purpose of extending the jurisdiction of the district courts to certain cases upon the lakes and navigable waters connecting the same; but the proper determination of the question thus raised requires an examination of the provisions of the constitution of the United States in respect to the admiralty and maritime jurisdiction of the national courts, the judiciary act of 1789, the act of 1845, and some of the decisions of the supreme court of the United States upon the subject of admiralty jurisdiction. The constitution declares that the judicial power of the national government shall extend to all cases of admiralty and maritime jurisdiction; and the judiciary act of 1789 (section 9) provides that the district courts shall have "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation, or trade of the United States, when the seizures are made on waters navigable from the sea, by vessels of ten or more tons burden within their respective districts, as well as upon the high seas," &c. The act of 1845, before referred to, is entitled "An act extending the jurisdiction of the district courts to certain cases upon the lakes and navigable waters connecting the same," and provides that "the district courts of the United States shall possess and exercise the same jurisdiction in matters of contract or tort, arising in, upon, or concerning steamboats or other vessels of twenty tons burden or upwards, enrolled and licensed for the coasting trade, and at the time employed in the business of commerce and navigation between ports and places in different states or territories upon the lakes and navigable waters connecting the said lakes, as is now possessed and exercised by the said courts in cases of like steamboats and other vessels employed in navigation and commerce upon the high seas, or tide waters, within the admiralty and maritime jurisdiction of the United States," &c.

It is insisted by the claimants that this court now has jurisdiction of cases arising on the Great Lakes only under this act of 1845; that therefore it cannot have jurisdiction in this case, because the Western was not enrolled or licensed for the coasting trade, because she was not, at the time of the salvage rendered to her, employed in the business of commerce or navigation between ports and places in different states or territories, but from one port to another in Canada, within the same jurisdiction, and because the act of 1845 limits the jurisdiction to matters of contract and tort, and a salvage case belongs to neither of those classes. The provisions of the constitution which define the limits of the judicial power of the national government does not, per se, confer jurisdiction upon any of the national courts, other than the supreme court, which is provided for by the constitution itself; and it was left to the national legislature to define and limit the power and jurisdiction of such inferior courts as the constitution authorized congress "from time to time to ordain and establish." This court must therefore exercise its authority within the limits of its jurisdiction, as declared and defined by congressional legislation. Congress might have conferred all original jurisdiction in admiralty cases upon the circuit courts, to the entire exclusion of the district courts, for the constitution leaves to the discretion of congress the distribution of the subjects and cases which they may

think proper to establish. In the exercise of that discretion, congress, in 1789, by the provisions of the judiciary act already quoted, declared that the district courts should have "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction"; thus conferring upon the district courts, in respect to civil causes, to which class this case belongs, as full and ample and unlimited original jurisdiction, in admiralty, as it was in the power of the national government to confer upon the national courts.

If the act of 1845 was not now in force, it would not, at this day, be seriously contended that this court had not jurisdiction of this case under the judiciary act of 1789; and yet, prior to 1845, the admiralty jurisdiction upon the Great Lakes of the Northwest had not been asserted or exercised, except in revenue cases. The reason of this, familiar as it now is to every admiralty lawyer, need not be given at length. It is to be found in the history of the administration of admiralty and maritime law by the courts of this country, and is set forth, very concisely, in the opinion of the learned and estimable chief justice of the supreme court of the United States in the case of The Genesee Chief, decided in that court in the December term. 1851 (12 How. [53 U. S.] 443). See, also, [The Magnolia], 20 How. [61 U. S.] 296, 299; 1 Conk. Adm. (2d Ed.) pp. 1–18.

The Genesee Chief was a case of collision. The collision occurred on Lake Ontario, and the libel was filed, as was supposed, under the act of 1845. It was insisted by the claimant in that case that the act of 1845 was unconstitutional; that the admiralty jurisdiction of the courts of the United States was limited by the constitution to tide waters; and that the district court had therefore no jurisdiction in the case.

In disposing of the question of jurisdiction thus raised, the learned chief justice said: "Before, however, we can look into the merits of the dispute, there is a question of jurisdiction which meets us at the threshold. When the act of congress was passed under which these proceedings were had, serious doubts were entertained of its constitutionality. The language and decision of this court, whenever a question of admiralty decision had come before it, seemed to imply that, under the constitution of the United States, the jurisdiction was confined to tide waters. Yet the conviction that this definition of admiralty powers was narrower than the constitution contemplated has been growing stronger every day with the growing commerce on the lakes and navigable rivers of the Western states. And the difficulties which the language and decisions of this court had thrown in the way, of extending it to those waters, have perhaps led to the inquiry whether the law in question could not be supported under the power granted to congress to regulate commerce. This proposition has been maintained in a recent work upon the jurisdiction, law, and practice of the courts of the United States in admiralty and maritime causes, which is entitled to much respect, and the same ground has been taken in the argument of the case before us. The law, however, contains no regulations of commerce, nor any provision in relation to shipping and navigation on the lakes. It merely confers a new jurisdiction on the district courts; and this is its only object and purpose. It is entitled 'An act extending the jurisdiction of the district courts to certain cases upon the lakes and navigable waters connecting the same'; and the enacting clause conforms to the title. It declares that these courts shall have, possess, and exercise the same jurisdiction in matters of contract and tort, arising in or upon or concerning steamboats and other vessels of twenty tons burden and upwards, enrolled and licensed for the coasting trade, and at the time employed in business of commerce and navigation between ports and places in different states and territories, as was, at the time of the passage of the law, possessed and exercised by the district courts in cases of like steamboats and other vessels employed in the navigation and commerce on the high seas or tide waters within the admiralty and maritime jurisdiction of the United States. It is evident, therefore, from the title, as well as the body of the law, that congress, in passing it, did not intend to exercise their power to regulate commerce, nor to derive their authority from that article of the constitution. And if the constitutionality of this law is supported as a regulation of commerce, we shall impute to the legislature the exercise of a power which it has not claimed under that clause of the constitution, and which we have no reason to suppose it deemed itself authorized to exercise. Indeed, it would be inconsistent with the plain and ordinary meaning of words to call a law defining the jurisdiction of certain courts of the United States a regulation of commerce. This law gives jurisdiction, to a certain extent, over commerce and navigation, and authorizes the courts to expound the laws that regulate them. But the jurisdiction to administer the existing laws upon these subjects is certainly not a regulation, within the meaning of the constitution. And this act of congress merely creates a tribunal to carry these laws into execution, but does not prescribe them.

"Nor can the jurisdiction of the courts of the United States be made to depend on regulations of commerce. They are entirely distinct things, having no necessary connection with one another, and are conferred in the constitution by separate and distinct grants. The extent of the judicial power is carefully defined and limited, and congress cannot enlarge it to suit even the wants of commerce, nor for the more convenient execution of its commercial regulations. And limits fixed by the constitution to the judicial authority of the courts of the United States would form an insuperable objection to this law, if its validity depended upon the commercial power.

This power is as extensive upon land as upon water. The constitution makes no distinction in that respect, and if the admiralty jurisdiction, in matters of contract and tort, which the courts of the United States may lawfully exercise on the high seas, may be extended to the lakes under the power to regulate commerce, it can, with the same propriety, and upon the same construction, be extended to contracts and torts on land when the commerce is between different states. And it may embrace also the vehicles and persons engaged in carrying it on. It would be in the power of congress to confer admiralty jurisdiction upon its courts over the cars engaged in transporting passengers or merchandize from one state to another, and over the persons engaged in conducting them, and to deny to the parties the trial by jury. Now, the judicial power in the cases of admiralty and maritime jurisdiction has never been supposed to extend to contracts made on land and to be executed on land. But if the power regulating commerce can be made the foundation of jurisdiction in its courts, and a new and extended admiralty jurisdiction, beyond its heretofore known and admitted limits, may be created on water under that authority, the same reason would justify the same exercise of power on land. Besides, the jurisdiction established by this act of congress does not depend on the residence of the parties; and, under the admiralty powers conferred on the district courts, they are authorized to proceed in rem or in personam, in the cases mentioned in the law, although the parties concerned are citizens of the same state. If the lakes and waters connecting them are within the admiralty and maritime jurisdiction, as conferred by the constitution, then undoubtedly this authority may be lawfully exercised, because this jurisdiction depends upon the place, and not upon the residence of the parties. But if the admiralty jurisdiction is confined to tide waters, the courts of the United States can exercise over the waters in question nothing more than ordinary jurisdiction in cases at law and equity. In cases of this description they have no jurisdiction, if the parties are citizens of the same state. This being an express limitation in the grant of judicial power, no act of congress can enlarge it, and, if the validity of the act of 1845 depended upon the power to regulate commerce, it would be unconstitutional, and could confer no authority on the district courts. If this law, therefore, is constitutional, it must be supported on the ground that the lakes and navigable waters connecting them are within the scope of admiralty and maritime jurisdiction as known and understood in the United States when the constitution was adopted. If the meaning of these terms was now for the first time brought before this court for consideration, there could, we think, be no hesitation in saying that the lakes and their connecting waters were embraced in them. These lakes are in truth inland seas. Different states border on them on one side, and a foreign nation on the other. A great and growing commerce is carried on upon them between different states and a foreign nation, which is subject to all the incidents and hazards that attend commerce on the ocean. Hostile fleets have encountered on them, and prizes been made, and every reason which existed for the grant of admiralty jurisdiction to the general government on the Atlantic seas applies with equal force to the lakes. There is an equal necessity for the instance and for the prize power of the admiralty court to administer international law, and, if the one cannot be established, neither can the other. Again, the Union is formed upon the basis of equal rights among the states. Courts of admiralty have been found necessary in all commercial countries, not only for the safety and convenience of commerce, and the speedy decision of controversies, where delay would often be ruin, but also to administer the laws of nations in a season of war, and to determine the validity of captures, and questions of prize or no prize, in a judicial proceeding; and it would be contrary to the first principles on which the Union was formed to confine these rights to the states bordering on the Atlantic, and to the tide-water rivers connected with it, and to deny them to the citizens who border on the lakes and the great navigable streams which flow through the Western states. Certainly, such was not the intention of the framers of the constitution; and, if such be the construction finally given to it by this court, it must necessarily produce great public inconvenience, and at the same time fail to accomplish one of the great objects of the framers of the constitution; that is, a perfect equality in the rights and privileges of the citizens of the different states, not only in the laws of the general government, but in the mode of administering them. That equality does not exist if the commerce on the lakes and on the navigable waters of the West is denied the benefits of the same courts and the same jurisdiction for its protection which the constitution secures to the states bordering on the Atlantic.

"The only objection made to this jurisdiction is that there is no tide in the lakes or the waters connecting them. and it is said that the admiralty and maritime jurisdiction, as known and understood in England and this country at the time the constitution was adopted, was confined to the ebb and flow of the tide. Now, there is certainly nothing in the ebb and flow of the tide that makes the waters peculiarly suitable for admiralty jurisdiction, nor anything in the absence of a tide that renders it unfit. If it is a public navigable water, on which commerce is carried on between different states and nations, the reason for the jurisdiction is precisely the same. And if a distinction is made on that account, it is merely arbitrary, without any foundation in reason; and, indeed, would seem to be inconsistent with it. In England.

undoubtedly, the writers upon the subject and the decisions in its courts of admiralty always speak of the jurisdiction as confined to tide water, and this definition in England was a sound and reasonable one, because there was no navigable stream in that country beyond the ebb and flow of the tide, nor any place where a port could be established to carry on trade with a foreign nation, and where vessels could enter or depart with cargoes. In England, therefore, 'tide water' and 'navigable waters' are synonymous terms, and tide water, with a few small and unimportant exceptions, meant nothing more than public rivers, as contradistinguished from private ones, and they took the ebb and flow of the tide as the test, because it was a convenient one, and more easily determined the character of the river; hence, the established doctrine in England that the admiralty jurisdiction is confined to the ebb and flow of the tide,—in other words, it is confined to public navigable water. At the time the constitution of the United States was adopted, and our courts of admiralty went into operation, the definition which has been adopted in England was equally proper here. In the old thirteen states, the far greater of the navigable waters are tide waters. And in the states which were at that period in any degree commercial, and where courts of admiralty were called on to exercise their jurisdiction, every public river was tide water to the head of navigation. And, indeed, until the discovery of steamboats, their could be nothing like foreign commerce upon waters with an unchanging current resisting the upward passage. The courts of the United States, therefore, naturally adopted the English mode of defining a public river, and consequently the boundary of admiralty jurisdiction. It measured it by tide water, and that definition, having found its way into our courts, became, after a time, the familiar mode of describing a public river, and was repeated, as cases occurred, without particularly examining whether it was as universally applied in this country as it was in England. If there were no waters in the United States which are public, as contradistinguished from private, except where there is tide, then unquestionably here, as well as in England, tide waters must be the limits of admiralty power. And as the English definition was adopted in our courts, and constantly used in judicial proceedings and forms borrowed from England, the public character of the river was in process of time lost sight of, and the jurisdiction of the admiralty treated as if it were limited by the tide. The description of a public navigable river was substituted in the place of the thing intended to be described. and, under the natural influence of precedents and established forms, a definition originally correct was adhered to and acted on, after it had ceased, from a change in circumstances. to be the true description of public waters.

It was under the influence of these precedents and this usage that the case of The Thomas Jefferson. 10 Wheat. [23 U. S.] 428, was decided in this court, and the jurisdiction of the courts of admiralty of the United States declared to be limited to the ebb and flow of the tide. The Orleans v. Phoebus, 11 Pet. [36 U. S.] 175, afterwards followed this case. merely as a point decided. It is the decision in the case of The Thomas Jefferson which mainly embarrasses the court in the present inquiry. We are sensible of the great weight to which it is entitled, but at the same time we are convinced that. if we follow it, we follow an erroneous decision into which the court fell, when the great importance of the question, as it now presents itself, could not be foreseen, and the subject did not therefore receive that deliberate consideration which at this time would have been given to it by the eminent men who presided here when that case was decided. For the decision was made in 1825, when the commerce on the rivers of the West and on the lakes was in its infancy, and of little importance, and but little regarded. compared with that of the present day. Moreover, the nature of the questions concerning the extent of the admiralty jurisdiction. which have arisen in this court, was not calculated to. call its attention particularly to the one we are now considering. The point in dispute has generally. been, whether the jurisdiction was not as limited in the United States as it was in England at the time the constitution was adopted. And, if it was so limited, then it did not extend to contracts for maritime services when on land, nor to torts and collisions on a tide-water river, if they took in the body of a county. The attention of the court, therefore, in former cases, has been generally strongly attracted to that question, and never, we believe, until recently, drawn to the one we are now discussing, except in the case of The Thomas Jefferson, afterwards followed in The Orleans v. Phoebus. as already mentioned. For, with this exception, the cases always arose on contracts for services on tide water. or were upon libels for collisions or other torts committed within the ebb and flow of the tide. There was therefore no necessity for inquiring whether the jurisdiction extended further in a public navigable water, and, following the English definition, tide was assumed and spoken of as its limit. although that particular question was not before the court. The attention of the court was, however, drawn to this subject in the case of Waring v. Clark, 5 How. [46 U. S.] 441, which was decided in 1848. The collision took place on the Mississippi river, near the Bayou Goulah. and there was much doubt whether the tide flowed so high. There was a good deal of conflicting evidence, but the majority of the court thought there was sufficient proof of tide there, and consequently it was not necessary to consider whether the admiralty power extended higher. But that

case showed the unreasonableness of giving a construction to the constitution which would measure the jurisdiction of the admiralty by the tide; for, if such be the construction, then a line drawn across the Mississippi would limit the jurisdiction, although there were ports of entry above it, and the water as deep and navigable, and the commerce as rich, and exposed to the same hazards and incidents, as the commerce below. The distinction would be purely artificial and arbitrary, as well as unjust, and would make the constitution of the United States subject one part of a public river to the jurisdiction of a court of the United States, and deny it to another part, equally public, and but a few yards distant.

"It is evident that a definition that would at this day limit public rivers in this country to tide-water rivers is utterly inadmissible. We have thousands of miles of public navigable waters, including lakes and rivers, in which there is no tide; and certainly there can be no reason for admiralty power over a public tide water, which does not apply with equal force to any other public water used for commercial purposes and foreign trade. The lakes and the waters connecting them are undoubtedly public waters, and we think are within the grant of admiralty and maritime jurisdiction in the constitution of the United States. We are the more convinced of the correctness of the rule we have now laid down, because it is obviously the one adopted by congress in 1792, when the government went into operation; for the ninth section of the judiciary act of 1789, by which the first courts of admiralty were established, declares that the district courts 'shall have exclusive cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under the laws of impost, navigation, or trade of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas.' The jurisdiction is here made to depend upon the navigable character of the water, and not upon the ebb and flow of the tide. If the water was navigable, it was deemed to be public; and, if public, was regarded within the legitimate scope of the admiralty jurisdiction conferred by the constitution. It so happened that no seizure was made, and no case calling for the exercise of admiralty power arose, for a long period of time upon any navigable water where the tide did not ebb and flow. As we have before stated, there were no navigable waters in the United States upon which commerce, in the usual acceptation of the word, was carried on, except tide water, until the valley of the Mississippi was settled and cultivated, and steamboats invented; and no case therefore came before the court during the early period of the government that required it to determine whether this jurisdiction could be extended above tide. It is per-

haps to be regretted that a case did not arise, for we are persuaded that if one had occurred, and attracted the attention of the court to this point before the English definition had become the settled mode of describing the jurisdiction, and before the courts had become accustomed to adhere strictly to the English mode of pleading, in which the place is always averred to be within the ebb and flow of the tide, the definition in the act of 1789, which is so evidently the correct one, would have been adopted by the courts, and the difficulty which has now arisen would not have taken place. This legislative definition, given at this early period of the government, is certainly entitled to great consideration. The same definition is, in effect, again recognized by congress by the passage of the act we are now considering. We have therefore the opinion of the legislative department of the government, twice deliberately expressed, upon the subject. These opinions, of course, are not binding on the judicial department, but they are always entitled to high respect. And in this instance we think they are founded in truth and reason, and that these laws are both constitutional, and ought therefore to be carried into execution. The jurisdiction under both laws is confined to vessels enrolled and licensed for the coasting trade; and the act of 1845 extends only to such vessels when they are engaged in commerce between different states or territories. It does not apply to vessels engaged in domestic commerce of a state; nor to vessels or boats not enrolled and licensed for the coasting trade under the authority of congress; and the state courts, within the limits embraced by this law, exercise a concurrent jurisdiction in all cases arising within their respective territories, as broadly and independently as it is exercised by the old thirteen states, whose rivers are tide waters, and where the admiralty jurisdiction has been in full force ever since the adoption of the constitution.

"The case of The Thomas Jefferson did not decide any question of property, or lay down any rule by which the right of property should be determined. If it had, we should have felt ourselves bound to follow it, notwithstanding the opinion we have expressed; for every one would suppose that, after the decision of this court, in a matter of this kind, he might safely enter into contracts, upon the faith that rights thus acquired would not be disturbed. In such a case stare decisis is the safe and established rule of judicial policy, and should always be adhered to; for if the law, as pronounced by the court, ought not to stand, it is in the power of the legislature to amend it, without impairing rights acquired under it. But the decision referred to has no relation to the rights of property. It was a question of jurisdiction only, and the judgment we now give can disturb no rights of property, nor interfere with any contracts heretofore made. The rights of property and of parties will be the same by whatever court

the law is administered; and, as we are convinced that the former decision was founded in error, and that the error, if not corrected, must produce serious public, as well as private, inconvenience and loss, it becomes our duty not to perpetuate it.

"The principal objection made to the admiralty jurisdiction is the want of the trial by jury, and it is this feature in the admiralty practice which made it the object of so much jealousy in England in the time of Lord Coke, and enabled him to succeed in his efforts to restrict it to very narrow limits. But experience in England has proved that a wider range of jurisdiction was necessary for the benefit of commerce and navigation, and that they needed courts acting more promptly than courts of common law, and not entangled with the niceties and strictness of common-law proceedings; and, during the reign of the present queen, the admiralty jurisdiction has been extended to maritime services and contracts, and to torts in navigable waters, although the place where the service was performed, or the contract made, or the tort committed, was within the body of a county, and within the jurisdiction of the courts of common law. A concurrent jurisdiction is reserved to the last-mentioned courts, if the party complaining chooses to select that mode of proceeding. But in the new and extended jurisdiction of the English admiralty, the old objection remains, and neither party is entitled to a trial by jury. The court, in its discretion, may send the question of fact to a jury, if it thinks proper to do so, but the party cannot demand it as a matter of right. Yet the English people have certainly lost nothing of their attachment to the trial by jury since the days of Lord Coke, and this recent and great enlargement of the admiralty power is strong proof that the want of it has been felt, and that experience has shown its necessity where the interests of an extensive commerce and navigation are concerned. But the act of congress of which we are speaking is free from the objection to which the English statute is liable. Like the English statute, it saves to the party a concurrent remedy at common law in any court of the United States or of a state which may be competent to give it. But it goes farther. It secures to the parties a trial by jury as a matter of right in the admiralty courts. Either party may demand it. And it thus effectually removes the great leading objection, always heretofore made to the admiralty jurisdiction. The power of congress to change the mode of proceeding in this respect in its courts of admiralty will, we suppose, hardly be questioned. The constitution declares that the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction. But it does not direct that the court shall proceed according to ancient and established forms, or shall adopt any other form or mode of

practice. The grant defines the subjects to which the jurisdiction may be extended by congress. But the extent of the power, as well as the mode of proceeding in which that jurisdiction is to be exercised, like the power and practice in all the other courts of the United States, are subject to the regulation of congress, except where that power is limited by the terms of the constitution, or by necessary implication from its language. In admiralty and maritime cases there is no such limitation as to the mode of proceeding, and congress may therefore, in cases of that description, give either party right of trial by jury, or modify the practice of the court in any other respect that it deems more conducive to the administration of justice. And in the proceedings under the act of 1845, the right of a trial by jury is undoubtedly secured to either party, if he thinks proper to demand it."

All the justices of the supreme court, with the exception of Mr. Justice Daniel, who dissented, concurred in this opinion of the chief justice; and the case of The Genesee Chief, in effect, determined that, prior to the passage of the act of 1845, the admiralty jurisdiction of the United States courts extended to all the public navigable waters of the United States, and consequently to the great Northwestern lakes; and, if the act of 1845 were repealed, there would be no ground for questioning the jurisdiction of this case.

In the case of Fretz v. Bull, 12 How. [53 U. S.] 466, decided immediately after the case of The Genesee Chief, the court maintained the admiralty jurisdiction in a case of collision occurring on the Mississippi river above tide water; and the same court has since maintained the jurisdiction in cases arising on the rivers of the West and Southwest, above the tide waters, when no jurisdiction could have been asserted under the act of 1845. Culberton v. Shaw, 18 How. [59 U. S.] 584; The Magnolia, 20 How. [61 U. S.] 296; Nelson v. Leland, 22 How. [63 U. S.] 48. See, also, the following cases in the circuit and district courts: Lucas v. The Thomas Swan [Case No. 8,588]; McGinnis v. The Pontiac [Id. 8,801]; Raymond v. The Ellen Stewart [Id. 11,594]; Sinnot v. The Dresden [Id. 12,908]; Franconet v. The Backus [Id. 5,048]; Parmlee v. The Charley Mears [Id. 10,766]; Eads v. The H. D. Bacon [Id. 4,232].

I have said that the case of The Genesee Chief, in effect, decided that prior to the act of 1845 the admiralty jurisdiction extended to all the public navigable waters of the United States, and consequently to the great Northwestern lakes. The district courts, therefore, had, from their first organization, original jurisdiction in all civil causes of admiralty and maritime jurisdiction arising on those lakes, by the express and unequivocal language of the judiciary act of 1789, already quoted. 1 Conk. Adm. (2d Ed.) p. 89. I am aware that this has been questioned, and that the case of The Genesee Chief does

not appear to have been decided under that impression. And I know that there are dicta of learned justices of the supreme court which give countenance to the opinion that jurisdiction in admiralty upon the great Western lakes was first conferred by the act of 1845, and that the learned author of Conkling's Admiralty has avowed the opinion that the act of 1845, although intended by congress to enlarge the jurisdiction of the admiralty, must, if not void, be held to restrain and limit it, and to take away, except in the cases provided for in the act of 1845, the admiralty jurisdiction on those lakes, which the district courts, before its passage, had had the right to exercise, under the judiciary act of 1789.

In the case of The Genesee Chief, the construction and effect of the judiciary act, conferring original jurisdiction upon the district courts in all civil causes of admiralty and maritime jurisdiction, do not appear to have been considered either by the counsel or by the court. The libellant's counsel did not assume that the supreme court had, for half a century, maintained erroneous doctrines upon the extent of the admiralty jurisdiction, but they insisted that the act of 1845 was constitutionally passed in the exercise of the power to regulate commerce granted to congress by the constitution. This doctrine the court repudiated, and they maintained the jurisdiction, upon a ground that counsel would hardly have been at liberty to assume the ground that the decisions of that court which declared that the admiralty jurisdiction provided for in the constitution was limited to tide waters were erroneous, and ought to be overruled. I shall not attempt either to criticise or confirm the language of the opinion in the case of The Genesee Chief. That the case was properly decided is now universally conceded, and if, as has been contended (1 Conk. Adm., 2d. Ed., pp. 1–18), the learned chief justice was mistaken in supposing "that congress, in passing it (the act of 1845), did not intend to exercise their power to regulate commerce, nor to derive their authority from that article of the constitution," that fact neither impairs the authority of the decision, nor weakens the force of the logical and convincing arguments by which the judgment of the court, reversing their former decision, was justified and sustained. Nor is it strange that the construction and effect of the judiciary act of 1789, and the effect of the act of 1845, upon the jurisdiction under the judiciary act, were not considered by the court, for the course of the argument had not brought these questions under consideration. The case, therefore, really decides nothing in regard to those questions; for, although the chief justice says "the act of 1845 confers a new jurisdiction on the district courts," it is evident that the question whether they had jurisdiction upon the lakes, under the judiciary act, prior to the

act of 1845, had not been carefully considered. If it had been, it is quite apparent the expression quoted would not have been used. The dicta of Justices Grier and McLean in the case of The Magnolia, 20 How. [61 U. S.] 296, are perhaps more direct and unequivocal expressions of opinion in regard to the question whether the act of 1845 conferred a new jurisdiction upon the district courts, although it is probable that those dicta had their origin in the dictum of the chief justice in the case of The Genesee Chief. It may be presumptuous to question the accuracy of the opinions expressed by those learned judges, but I cannot believe that they had carefully examined the provisions of the judiciary act, and deliberately considered the questions, before using the expressions found in their opinions. At all events, the question was not in controversy in the cases under consideration, and the opinions thus expressed cannot therefore be regarded as binding authorities in this court. Nevertheless, they are entitled to great respect, and they have weakened my confidence in the correctness of my own views, although I am not able, after deliberate consideration, to concur in the views thus expressed. In the opinion referred to, Mr. Justice Grier, referring to the act of 1845, says: "As congress had never before 1845 conferred admiralty jurisdiction over the Northern fresh water lakes not navigable from the sea, the district courts could not assume it by virtue of this clause in the constitution. An act of congress was therefore necessary to confer this jurisdiction on those waters," &c. Mr. Justice McLean, in the same case. in reference to the act of 1845, says (page 203): "This act was considered by congress as extending the jurisdiction of the district courts, and it was so very properly treated by the court in the case of The Genesee Chief. * * * It is said in that case the act of 1845 extended the jurisdiction of the admiralty; and this was so, as, by the act of 1789, it was limited to rivers navigable from the sea by vessels of ten tons burden and upwards."

It is quite clear that Mr. Justice Grier and Mr. Justice McLean had not carefully considered the language of the judiciary act, for it appears to me to be too plain to be open to controversy that the limit of the jurisdiction to "waters navigable from the sea by vessels of ten or more tons burden," applies to cases of seizure only, and not the ordinary civil causes of admiralty and maritime jurisdiction. This is the fair, and it seems to me to be the only reasonable, construction of the act; for the language first used, in reference to civil causes, &c., is substantially the language of the constitution, and was intended to be distinct, full, and complete in respect to such causes. The subsequent language was clearly intended to refer to and affect seizure cases only, and had no application to other cases. Indeed, I did not un-

derstand the learned counsel for the claimants to insist that the admiralty jurisdiction under the judiciary act was limited, in other than seizure cases, to "waters navigable from the sea by vessels of ten or more tons burden." His argument was based mainly upon the idea that the act of 1845 was restrictive of the jurisdiction conferred by the judiciary act, and that taking the two statutes together, the jurisdiction upon the Great Lakes is limited to the cases provided for in the act of 1845. He insisted 'hose acts are in pari materia; that effect must be given to both as though all their provisions were contained in one act; and, thus construed, it was clear the act of 1845 must control in regard to the jurisdiction upon the Great Lakes.

The object to be attained in the construction of all statutes is to ascertain the intention of the legislature, and all rules of construction are intended to conduce to that end. In respect to the judiciary act, it is entirely clear that it was the intention of congress to give to the district courts unrestricted original jurisdiction in all ordinary civil causes of admiralty and maritime jurisdiction: to confer on them as broad and ample original jurisdiction in regard to those causes as could be conferred under the constitution. It is equally clear that the congress of 1845 did not intend to restrict the jurisdiction, but supposed that they were extending it. If the actual intention of the legislature is to govern, the act of 1845 cannot be held to take away any jurisdiction conferred by the judiciary act of 1789. There are no words declaring that any other statute is repealed, or that the jurisdiction shall extend only to the cases provided for in the statute of 1845.

The view which I have thus taken of this question is not unsupported by authority. In this district it has had, in practice, the general sanction of those who practice in this court; for during the last ten years I have exercised the jurisdiction in a considerable number of salvage cases, without question, and in many other cases, in which no jurisdiction could be asserted under the act of 1845, I have taken jurisdiction under the judiciary act of 1789, without the jurisdiction being seriously questioned. In some of these cases, appeals have been made to the circuit court—probably without the jurisdiction being questioned in that court, and my decisions affirmed, and I do not doubt that such has been substantially the course of decisions in other districts bordering on the Great Lakes.

In the case of Franconet v. The Backus [Case No. 5,048], the learned judge of the Michigan district declared that the jurisdiction of this court in admiralty cases did not rest on the act of 1845; and in the case of Parmlee v. The Charles Mears [Id. 10,766], the learned judge of the Northern district of Ohio declared that the supreme court in the case of The Genesee Chief had "placed the admiralty jurisdiction on the lakes on the same basis as that of the tide and salt waters. Hence now, independent of the act of February, 1845, the maritime law has the same application to the cases upon the lakes as it has upon the tide waters, not only in matters of jurisdiction, but also in forms of procedure and practice." In 1860, in the case of The Revenue Cutter No. 1 [Id. 11,713], the same learned judge held that "admiralty and maritime jurisdiction is possessed by the district court of the United States on the Western lakes and rivers, under the constitution and act of 1789, independent of the act of 1845, and unrestricted thereby." The question of jurisdiction has been fully argued, and Judge Wilson, in his opinion, among other things, says: "But the law of 1845 does not repeal or otherwise abrogate the ninth section of the law of 1789, or any part of it. At most, it can only be regarded as affording remedies which are cumulative upon former laws. It designates a class of vessels of twenty tons burden and upwards, that are enrolled and licensed for the coasting trade, and at the time employed in business of commerce and navigation between ports and places in different states and territories upon the lakes. It makes no provision in relation to vessels engaged in the foreign trade, nor does it embrace remedies upon a large variety of maritime contracts having no connection with the navigation and trade between different states. We know of no rule of construction by which the act of 1845 should be held to have the effect of repealing any portion of the ninth section of the judiciary act, or to abridge any of the admiralty powers conferred upon the district courts by the statute of 1789. Its purpose, as avowed in its title, is 'to extend the jurisdiction of the district courts,' and it certainly cannot be so construed as to limit or abridge an existing jurisdiction. This interpretation and construction of the act of 1845, as to its effect upon previous legislation, is amply sustained by authority. When a statute gives a new remedy, without impairing or denying one already known to the law, the rule is to consider it as cumulative, allowing either the new or the old remedy to be pursued. 15 Ohio, 65; 3 Hill, 41; 15 Johns. 222. To repeal a statute by implication, it is not sufficient to establish that subsequent laws cover some, or even all, of the cases provided for by the prior law, for they may be merely affirmative, or cumulative, or auxiliary. But there must be a positive repugnancy, and, even then, the old law is repealed only pro tanto, to the extent of the repugnancy. [Wood v. U. S.] 16 Pet. [41 U. S.] 362; 3 Hill, 646. There is no repugnancy between the acts of 1789 and 1845. Under the former law, the district courts have jurisdiction of vessels under 20 tons burden, whether enrolled and licensed or not, and also of vessels employed in the foreign trade, and they have jurisdiction of those exceeding 20 tons burden that are enrolled and licensed and engaged in navigation between different states, not only by virtue and under the authority of the act of 1789, but also

of the act of 1845; and yet the right of trial of facts put in issue to a jury is secured in all cases. This we believe to be the true import and legal effect of the two acts of congress, when considered and construed together." But it is considered that the case of Allen v. Newberry, 21 How. [62 U. S.] 244, and McGuire v. Card, Id. 248, are authorities against the jurisdiction of this court in the present case. The question of jurisdiction was not discussed on the argument of Allen v. Newberry, but the learned judge who delivered the opinion, taking it for granted that the admiralty jurisdiction upon the Great Lakes depended upon the act of 1845, held that a suit could not be maintained in admiralty upon a contract of affreightment for the transportation of property from one port to another in the same state. In the case of McGuire v. Card [supra] it was held that the admiralty had no jurisdiction to enforce the claim of a material man for supplies to a vessel employed wholly within the state of California, and in the purely internal trade of that state. and both these cases were apparently decided on the ground that cases arising out of, and concerning only the purely internal commerce of a state, should be left to the adjudication of the state courts. The same doctrine is again adverted to in Nelson v. Leland, 22 How. [63 U. S.] 48, and in Bondies v. Sherwood, Id. 217.

I confess that I am not able to perceive any solid ground for thus restricting the admiralty jurisdiction of the national courts. The constitutional grant of admiralty jurisdiction has no such limitation. It is an independent grant of judicial power or jurisdiction, unconnected with the grant of commercial power, and, to adopt the language of Mr. Justice Grier, in the case of The Magnolia, 20 How. [61 U. S.] 301, when it is used for another purpose: "The admiralty jurisdiction surrendered by the states to the Union had no such bounds as exercised by themselves, and is clogged with no such conditions in its surrender." In The Genesee Chief, it was said by the chief justice: "Nor can the jurisdiction of the courts of the United States be made to depend on regulations of commerce. They are entirely distinct things, having no necessary connection with one another, and are conferred in the constitution by separate and distinct grants. The extent of the judicial power is carefully defined and limited, and congress cannot enlarge it to suit even the wants of commerce, nor for the more convenient execution of its commercial regulations." It was conclusively shown in that case that the power of regulating commerce could not be made the foundation of jurisdiction in the courts of the United States, and I cannot satisfy myself that the courts of the Union are justified in interpolating the language or limits of the grant of the commercial power into the grant of judicial power and jurisdiction, for the purpose of restricting. any more than of enlarging, their jurisdiction. That jurisdiction must rest upon the constitutional grant of judicial power, and upon the acts of congress passed in pursuance thereof; and, if neither the constitution nor the acts of congress have prescribed a particular limitation to a power conferred in unrestricted terms, such limitations should not be interposed by judicial construction.

Although entertaining these views, I shall cheerfully recognize paramount authority of the supreme court, decline the exercise of admiralty jurisdiction in every case, and like that of Allen v. Newberry, or like that of McGuire v. Card, when the supreme court has deliberately decided any question before it, whether of jurisdiction or otherwise, I shall always hold this court to be conclusively bound by such decision. But the Western was not engaged in the purely internal trade of a state. She was engaged in a foreign voyage through the waters of the United States and those of a foreign government, and no question of state rights, or of the greater propriety of the determination of this case by the state courts, is therefore involved in its determination. It is a case which had its origin beyond the limits of the United States, and is one peculiarly of admiralty jurisdiction. It is true, the jurisdiction cannot be maintained under the act of 1845, but it was certainly conferred by the act of 1789, and I cannot think it was taken away by the act of 1845. It is not to be denied that the dicta above referred to afford strong grounds for urging upon this court the dismissal of this suit for the want of jurisdiction, but, in the hurry of writing opinions, the ablest judges will sometimes express erroneous opinions, or mistake the facts of a particular case. In the case of The Genesee Chief, the chief justice, at page 458, says, in reference to the judiciary act and the act of 1845: "The jurisdiction under both laws is confined to vessels enrolled and licensed for the coasting trade," and yet for more than half a century the district and circuit and supreme courts have exercised jurisdiction in numerous cases against registered and foreign vessels. Probably not more than three-fourths of the vessels arrested under the process of our admiralty courts have been enrolled and licensed for the coasting trade, and I am wholly unable to conjecture upon what grounds the chief justice supposed he was making this assertion in respect to the provisions of the judiciary act. As the supreme court, in the case of Bondies v. Sherwood, before cited, expressly refused to decide the question of jurisdiction in a salvage case when the vessel was engaged in the purely internal trade of a state, as the question now presented has never in fact been decided in that court, and as I cannot myself doubt that this court has jurisdiction, I shall maintain the jurisdiction in the present case, notwithstanding the cases of Allen v. Newberry and McGuire v. Card, and the dicta above referred to.

It was urged upon the hearing that the libelants had forfeited their right to a salvage compensation in this case by their misconduct in bringing the Western and cargo from Port

Stanley to Buffalo. The question thus raised will now be considered. It is undoubtedly true that any culpable disregard of their duty on the part of the sailors will justify, and, indeed, require, a reduction of the salvage compensation which would otherwise be awarded. This reduction will be more or less in proportion to the misconduct, whether slight or aggravated, and the degree of injury or inconvenience resulting therefrom, to those interested in the property saved, and gross misconduct or wilful negligence will, in many cases, work an entire forfeiture of salvage. There is, however, no inflexible rule that salvors must take the property saved to the nearest convenient port, or retain the property for adjudication at the first port at which it arrives in safety. Post v. Jones, 19 How. [60 U. S.] 150. In all their proceedings, they should act in good faith, and with reasonable skill and judgment; and, while they are entitled to protect their own interests by proper means, they must not forget or disregard the interests of the owners of the property saved. In view of these principles, it is proper to refer to the particular facts of this case. It was near midnight when the Western and cargo reached Port Stanley, a port at which scarcely any wheat is received from vessels, and in which there was no elevator for taking grain from on shipboard. The storehouses in which grain is received by land carriage were some distance from the pier, and the water in front of them was probably so shallow that the Western could not be taken there until a portion of her cargo was discharged. There was no drying kiln for drying wet grain, and no shipyard or dockyard for the examination or repairs of the vessel. In short, the master of the Illinois had good reason to suppose that Buffalo was a much better port than Port Stanley for the discharge of the vessel, and the security and sale of her cargo, as well as much better place for the repairs of the Western. Besides, it was necessary he should proceed at once with his own vessel, or subject his owners to inconvenience and loss, and he proceeded to Buffalo, that he might discharge his freight. His owners then sent another vessel to bring the Western to Buffalo, that the cargo might not be injured by unnecessary delay. If the master of the Illinois had known that the Western could be discharged at Port Stanley by hand labor, and that storage for dry wheat could be obtained at one storehouse, and for the wet wheat on the floor of another; that there were there two or three ship carpenters without capital, but who worked as such by the day, and could repair vessels when the injuries were above water, if the necessary material were furnished them; that there were distilleries within a distance of three to five miles, whose owners might, perhaps, buy the wet wheat,—in short, had he known all the facts proved on this trial,—he would not have been guilty of misconduct, and I am not prepared to say he would have erred in judgment had he decided that it was for the interest of all parties to bring the Western and cargo to Buffalo. He had found the Western abandoned and water logged. The interest of the salvors was, prima facie, not much less than one third of her value. The salvors' compensation might, in case of the sale of vessel and cargo, depend very much upon the amount for which the property could be sold; and, in all reasonable probability, it could be better secured, and sold on more favorable terms, at Buffalo than at Port Stanley. Besides, there was no admiralty court in Canada West, and the salvors had a right, if it could be done without great prejudice to the owners of the property, to bring the vessel and cargo within the jurisdiction of an admiralty court, for the purpose of prosecuting their claim for salvage, unless the owners thought proper to offer a fair salvage compensation, in order to entitle themselves to the possession and control of the property. If a fair salvage compensation had been tendered at Port Stanley, and had been refused, the case would have been entirely different. But no compensation was tendered, no offer to pay or secure, or in any form provide a compensation to, the salvors was made or apparently thought of. In addition to all this, the owner of the Western, when he arrived at Port Stanley, expressed his regret that the vessel and cargo had not been taken to Buffalo or Cleveland, rather than to Port Stanley, and, when informed that they would probably be taken to Buffalo, he did not object. He afterwards came with the vessel to Buffalo without objection. Indeed, it is quite apparent he approved the course taken by the salvors in this removal of the Western from Port Stanley, the agents of the insurance company alone objecting.

It was insisted that the salvors were so intent on securing an undue salvage compensation, that they acted in utter disregard of the rights of others, and it may be true that they regarded their own interests as paramount; but, on the other hand, there was, on the part of the insurance agent at Port Stanley, an apparent disposition to act in entire disregard of the salvors' just and legal claims, and of their undoubted right to hold possession of the property until their compensation, as salvors, had been paid or provided for. It is not improbable that both parties looked most earnestly to their own interests, in preference to interests directly opposed to theirs; but I can see no evidence of any intention on the part of the salvors to do any act in clear violation of the legal rights of others, or to seek, by physical strength, to carry out a purpose which could not be justified upon the principles of law or of moral or commercial ethics. I shall therefore hold that there has been no forfeiture of the rights of the salvors in this case.

The only remaining question which I deem it necessary to discuss relates to the amount and disposition of the salvage compensation to be awarded. It was said by the counsel for the libellant that it was desirable that some general rule should be laid down in this

[29 Fed. Cas. page 789]

case, in order that vessel and steamboat owners might know what to depend upon in salvage cases, and be able to instruct their masters accordingly; but this is impossible, for the amount of salvage must always rest almost wholly in the discretion of the court. It must necessarily depend upon the peculiar circumstances of each peculiar case. No definite rule can be applied in these cases, and, though the general principles upon which courts of admiralty proceed may be gleaned from the cases decided, the application of those principles must, in almost every case, require the exercise of an almost unlimited judicial discretion. Any general rule that could be adopted would be almost necessarily as indefinite as the provisions of the laws of Oleron, which directed that salvage should be awarded "according to right reason, a good conscience, and as justice shall appoint." The supreme court of the United States has said, in respect to the amount of salvage compensation: "On this subject there is no precise rule; for it must, in every case, depend upon peculiar circumstances, such as peril incurred, labor sustained, value saved, &c.; all which must be estimated and weighed by the court which awards the salvage." The Adventure, 8 Cranch [12 U. S.] 221. It is true that it was formerly said "that the rate of salvage on derelicts ought not, in ordinary cases, to range below a third or above a moiety of the value of the property" (Rowe v. The Brig [Case No. 12,093]; 3 Hagg. Adm. 167–221); but exceptions to this rule were allowed in numerous cases, and the rule itself has now been abrogated. The supreme court of the United States and the high court of admiralty in England have respectively sanctioned the doctrine that the reward in derelict cases should be governed by the same principles as other salvage cases, namely, danger to property, value, risk of life, skill, labor and the duration of service; and that no valid reason can be assigned for fixing the reward for salving derelict property at a moiety, or any given proportion, and that the true principle is adequate reward, according to the circumstances of the case. The Florence, 20 Eng. Law & Eq. 622; The Sarah Bell, 4 Notes Cas. 144; Post v. Jones, 19 How. [60 U. S.] 161. And, in view of this abrogation of the rule of giving one third to one half of the proceeds of the property saved in a case of derelict, the question whether this is a case of derelict which was under discussion at the hearing is of little practical consequence. That in the English admiralty it would be held to be a case of derelict seems to be established by the late case of The Coromandel, Swab. Adm. 205. As a salvage compensation is never awarded when the efforts made for the purpose of rescuing a ship or other property from an impending danger have not been attended with success, courts of admiralty have, with great propriety, generally allowed very liberal compensation in salvage cases. But in cases where the property saved has

remained in the possession of its owners or their agents, and in which there has been no unusual fatigue or effort or risk on the part of those rendering assistance, the compensation allowed has not ordinarily greatly exceeded a fair and liberal compensation for the service rendered and risk encountered. In cases of a wholly different character, when the value of the property saved was very large, the peril extreme, and the danger pressing; when its complete rescue from total loss was accomplished at the imminent risk of the lives of the salvors, and after long continued, severe, and exhausting labor, requiring abstinence from accustomed rest, and extraordinary exposure and suffering, as well as daring enterprize and superior skill; and when a valuable ship and cargo, or a steam vessel of great value and power, were put in jeopardy by the salvors to secure the lives and property of others,—courts of admiralty have uniformly allowed a most liberal and generous rate of salvage, not only as the just remuneration for noble and chivalric effort and highly meritorious service, and as an ample reward for the risks encountered and sufferings endured, but also as an incentive to the rendition of similar services in like cases. Such liberal allowances are dictated by an enlightened and enlarged public policy; and the interests of commerce, no less than the general interests of humanity, require that such policy be steadily adhered to in the admiralty courts.

In the case of The Henry Ewbank [Case No. 6,376], the late Mr. Justice Story most eloquently and truly said: "Salvage, it is true, is not a question of compensation pro opere et labore. It rises to a higher dignity. It takes its source in a deeper policy. It combines with private merit and individual sacrifices larger considerations of the public good, of commercial liberality, and of international justice. It offers a premium by way of honorary reward for prompt and ready assistance to human suffering, for a bold and fearless intrepidity, and for that affecting chivalry which forgets self in an anxiety to save property, as well as life." But salvors must be assiduous, discreet, and skillful, and they must not be regardless of the interests of the owners of the property saved, if they seek to merit this most liberal compensation. Negligence or misconduct will always reduce their claims to a salvage compensation, and gross misconduct or willful negligence may work a forfeiture of their claims. They must not be rapacious or grasping, and, though entitled to protect their rights as salvors, any attempt to appropriate the property of others to their own use without proper authority will be followed by merited and severe punishment. The duty of courts of admiralty to protect the interests of the unfortunate owners whose property has been subjected to salvage claims was well stated by the late Judge Hopkinson in the case of Hand v. The Elvira [Id. 6,015], when he said: "We must

not teach a salvor that he may stand ready to devour what the sea may spare. He must not be permitted to believe that he brings in a prize of war, and not a friend in distress. If he has offered his assistance to the distressed in a proper spirit, he will be satisfied with a just and fair remuneration for the labor, hazard, and exposure he has encountered in the service, and it is only a proper spirit that we should seek or desire to satisfy. To the manner of compensation, the judge, governed by a liberal policy, will add a reasonable encouragement, which the generous or humane will hardly need to prompt men to exertion to relieve their fellow men in danger or distress." In this case all the persons entitled to salvage have not been made parties to the suit, and, of course, only the services of those who have been made parties can now be compensated. The master and crew of the Illinois were hired and paid by the month, and that vessel was supplied and navigated solely at the expense of the owners. The wages of the crew, and all of the expenses of the vessel, during the time they were employed in the salvage service, were therefore paid by the owners; they also paid for extra hands to work the pumps, and they furnished the propeller which towed the Western from Port Stanley to Buffalo. They took the risk, so far as risk was incurred, of a propeller worth $17,000, and a cargo worth more than $21,000, and it was mainly by the use of the steam power of the propeller that the salvage service was rendered. This entitles them to a liberal compensation.

. A wise commercial policy, as well as the interests of humanity, require that owners of steam vessels having valuable cargoes on board should feel assured that, if such vessels render important salvage service to vessels in distress, they will be generously remunerated. Steam vessels are generally much the most efficient aids to vessels in distress, and courts of admiralty should therefore be careful to compensate their service, in a proper case, with sufficient liberality, that their owners may not feel bound, for the protection of their own interests, to forbid their masters undertaking the rescue of vessels in distress. The immediate responsibility of undertaking a salvage service must, until his action is approved by his owners, rest mainly upon the master. The master is therefore entitled to a fair compensation for his services, and a liberal allowance for his responsibility; but it should not be so large as to appear to offer any temptation to masters to forget the interests of their owners in a too eager and energetic pursuit of their own.

After much consideration, I have determined that 22½ per cent. of the value is a fair allowance for the salvage of the Western and cargo. As all the parties originally entitled to salvage are not before the court, I shall award to the parties to this suit, for services and saving the Western the sum of $840; for their proportion of the salvage of her cargo,

$657,—total, $1,497. These sums must therefore be paid into court within thirty days after the entry of the decree, and will be distributed to the libelants as follows, or in the following proportions, if a greater or less sum shall ultimately be paid into court, viz.:

| | | |
|---|---|---|
| To the Western Transportation Co., as owner of the propeller Illinois.. | $1,100 | 00 |
| " Henry W. Thorp, her master.... | 200 | 00 |
| " Peter F. Low, second mate...... | 45 | 00 |
| " William S. Brown, watchman.... | 45 | 00 |
| " Henry Fleming, wheelsman...... | 45 | 00 |
| " Richard Lee, second engineer..... | 30 | 00 |
| " Michael Ryan, fireman.......... | 17 | 00 |
| " John Kinsey, porter............ | 15 | 00 |
| | $1,497 | 00 |

The libellants will recover their costs to be taxed, and the claimants of the Western and their stipulators will be decreed to pay, within thirty days from the entry of this decree, 45-82d parts thereof; and the claimants and stipulators for the cargo, 56-82d parts thereof.